RUTHERFORD *v.* MASSACHUSETTS MUT. LIFE INS. CO.

*(Circuit Court, S. D. New York. April 8, 1891.)*

PLEDGE—RELEASE OF EQUITY—CONSIDERATION.

Plaintiff had pledged certain securities to defendant to secure the payment of a note. Upon non-payment at maturity, defendant advertised the securities for sale at auction. Upon plaintiff's representations that he was unable to pay the debt at that time, and that the securities, which were of uncertain value, and had no market price, would not realize any considerable sum if sold at forced sale, defendant accepted a transfer of them, with the undertaking on its part to sell them at private sale at the best terms obtainable, and, after paying the debt and expenses, to pay one-half the net surplus to the plaintiff. After nearly two years, during which plaintiff was unable to obtain any price at which he could realize any surplus, defendant sold them for a sum somewhat in excess of the debt and interest. *Held*, that such a release of the plaintiff's equity of redemption, made at a time subsequent to the original pledge, is not invalid, and that the undertaking of the defendant to sell the securities at private sale was a sufficient consideration to support it.

In Equity.
*William W. Cook*, for complainant.
*James L. Bishop*, for defendant.

WALLACE, J.   This case turns upon the legal effect of the agreement between the parties of the date of December 9, 1887.   The theory of the plaintiff's bill is that he is the pledgeor and the defendant the pledgee of the securities described in that agreement, and as such is entitled to redeem upon payment of the indebtedness for which the securities were pledged as collateral, when the amount is found due upon an accounting between the parties as to dividends received by the defendant and payments made by the plaintiff subsequent to December 9, 1887.   The theory of the defendant is that by the agreement of December 9th the previous relations of the parties as pledgeor and pledgee ceased, and the defendant became the owner of the securities, and that thereafter its only obligation to the plaintiff was to account to him for one-half of any surplus it might realize upon a sale of the securities beyond the amount of the plaintiff's indebtedness and its own disbursements and expenses on account of the securities.

. The proofs show the following facts:   In November, 1884, the defendant loaned to plaintiff $15,000, and took his note payable in six months, and as collateral the plaintiff pledged to defendant the securities in controversy.   The plaintiff was unable to pay the note when it matured, and the time of payment was extended by the defendant until December, 1886, when the defendant advertised the securities for sale at public auction.   In the mean time the defendant had advanced further moneys to the plaintiff, for which it held his note and the securities as collateral.   The plaintiff being in default, the defendant again advertised the securities for sale at public auction, the sale to take place at Springfield on November 19, 1887.   At the request of the plaintiff the defendant suspended the sale until a later day.   On the day before the securities were to be sold the plaintiff called upon the officers of the defendant, represented his inability to pay his notes, or get the loan transferred, or sell his securities, as he had hoped to be able to do, and proposed to transfer the securities to the defendant, if the latter would release him upon his notes.   The securities were of uncertain value and had no market price, and the officers of the defendant considered it very doubtful whether any considerable sum could ever be realized from them; and they told the plaintiff this, and informed him that they preferred to sell the securities for what they would bring, and look to him for the balance.   The plaintiff then suggested that the securities would not bring much at forced sale, and probably if they were not sold, and he remained interested in them, he might be able to make an advantageous sale; and he then proposed to transfer the securities to the defendant, upon the agreement that if the defendant should realize out of them more than its debt he should have one-half of the surplus.   The officers of the defendant assented to this proposition.   The amount owing by the plaintiff was ascertained and agreed upon at $18,280, as of the first day of January next ensuing.   The agreement was then drawn up and executed. It reads as follows:

"In consideration of the agreements hereinafter contained on the part of the Massachusetts Mutual Life Insurance Company, I, John W. Rutherford,

hereby sell, transfer, and assign to said company all my right, title, and interest in or to the five hundred shares of the St. Joseph Water Company stock, (certificate No. 22,) and one hundred and twenty-five shares of the Austin Gas-Light Company's stock, (certificate No. 27,) pledged by me to said company as collateral to my indebtedness to it.   In consideration of the aforesaid, said company agrees that upon the ultimate sale of said stock by it it will apply the proceeds,—*First*, to pay such proper expenses as may be incurred by it in connection with said stock; *second*, to pay all sums paid out by it, or which may hereafter be paid out by it, on account of said stock, or to protect its interest therein; *third*, to apply the balance upon said Rutherford's indebtedness to it, principal and interest; *fourth*, to pay one-half of any and all sums so received after making the payments and application aforesaid to said John W. Rutherford.

"*Dated at Springfield, Mass., this 9th day of December,* 1887."

The notes of the plaintiff were not surrendered to him, nor was anything said specifically by him or the officers of the defendant as to extending his time for the payment of his indebtedness.   The securities were not sold at auction, and in October, 1889, the defendant sold them to one Chew for the price of $20,903.   Notice of the proposed sale was not given to the plaintiff.   The sale was a *bona fide* sale, and the price obtained was the best the defendant could obtain.   During the period of nearly two years that had elapsed since the agreement of December 9th, the plaintiff had been unable to find a purchaser for the securities at a price at which he could realize any surplus, and during that time he did not communicate with the defendant.   No proceedings were taken by the defendant to enforce the notes of the plaintiff during that period.

Upon these facts the plaintiff is not entitled to any relief.   By the agreement of December 9th he released his equity to redeem the securities, and the parties substituted the relation of vendor and vendee for that of pledgeor and pledgee.   Such is the plain meaning of the agreement when its language is read in the light of the extrinsic circumstances surrounding its execution.   Unless it was intended by the parties to have this effect, there was no conceivable reason for making it.   If there was a sufficient consideration, and the transaction was free from oppression on the part of the defendant, and was deemed at the time to be for the best interests of both parties, the agreement is not obnoxious to any rule of law or equity.   As in the case of a mortgage, so in a pledge, the equity of redemption of the debtor cannot be waived or surrendered by any stipulation of the parties made at the time of the original contract. The courts have always asserted this doctrine as one necessary to the protection of the debtor who, under the pressure of necessity, and in the hope of saving a forfeiture by meeting his obligation at maturity, might be constrained to submit to ruinous terms as the condition of a loan. But there is nothing in the policy of the law which forbids a subsequent release of the equity of redemption, though the transaction will be jealously scrutinized, in order to prevent any oppression of the debtor.   The law is stated in Jones, Pledges, § 555, as follows:

"The parties may at a time subsequent to the pledge agree that the creditor shall take the pledge in satisfaction of the debt, and their contract to this

effect, if clearly proved, will be enforced.   They may also agree that the creditor may sell the property at a stipulated price, or may himself take the property at that price, and credit the pledgeor with the amount."

There was a sufficient consideration for the agreement in the abandonment of the pending auction sale of the securities, and also in the new obligations which the defendant assumed towards the plaintiff.   Before making the agreement, and while the relation between the parties was merely that of pledgeor and pledgee, the defendant was under no obligation to sell the securities, or attempt to do so.   It could have retained them, and, while inert, could have enforced payment of the debt from the plaintiff by suit.   Its whole duty to plaintiff would have been discharged by keeping the securities ready to be delivered to him upon the payment of the debt for which they were pledged.   But by the new agreement it assumed the active duty of making a sale of the securities for the benefit of the plaintiff.   The stipulation by which it undertakes to make a specified application of the proceeds "upon the ultimate sale of said stock by it" implies an obligation on its part to exercise the power of sale, (*Jones* v. *Kent*, 80 N. Y. 585;) and the provision whereby the plaintiff is to have one-half of the net surplus arising from the sale creates an obligation by the defendant to exercise an honest discretion, and act with a reasonable regard to the interests of the plaintiff in making the sale; and it cannot be doubted that for any breach of that obligation the plaintiff would have a remedy.   The language of the instrument is inconsistent with any other understanding of the parties than that the former relation between them should cease, and the defendant should thenceforth have the unqualified title to the securities, and the plaintiff have merely a contingent interest in their proceeds, or a remedy against the defendant for a failure to perform its duty in selling it.   It does not contain any suggestion that the securities are to be held by the defendant as collateral, nor any condition whereby the absolute transfer on the part of the plaintiff is to be avoided upon payment of the debt.   On the other hand, by providing that the defendant is to have one-half of the proceeds of the sale after the debt and disbursements are satisfied, the defendant is authorized to sell the stock, notwithstanding previously the plaintiff may have paid the debt and disbursements.

The testimony of the plaintiff to the effect that before he signed the instrument he was promised by the officers of the defendant that they would notify him before selling the securities is not credible, and, if it were, cannot be permitted to qualify the terms of the instrument, or any of the conditions implied from what is expressed.   The right of the defendant to sell the stock at its discretion, and deal with its owner, being expressly manifested by the language of the instrument, cannot be curtailed by oral evidence of an antecedent promise into one to do so upon giving the plaintiff notice.   An instructive authority in point is *Eighmie* v. *Taylor*, 98 N. Y. 288.

There is nothing in the circumstances of the case to impugn the fairness and reasonableness of the agreement.   It was manifestly made in the interests of both parties, and in the expectation that a sale could be

made at a future time, and by private negotiations, by which more could be realized than at the pending auction sale. Upon the proofs there seems to be no reason to doubt that it has been carried out in good faith on the part of the defendant.

The bill is therefore dismissed.